IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAURENCE J. SHERIDAN, Plaintiff, | |
| v. | CIVIL ACTION NO. |
| CHILDREN'S HOSPITAL OF PHILADELPHIA, Defendant. | JURY TRIAL DEMANDED |

COMPLAINT

Plaintiff, Laurence J. Sheridan, by and through his counsel, files this Complaint against his former employer, Children's Hospital of Philadelphia ("CHOP"), for discrimination and retaliation in violation of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, et. seq. ("ADA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1101, et. seq. ("PFPO").

INTRODUCTION

Since the passage of the Americans with Disabilities Act (ADA) more than thirty-five (35) years ago, this country has implemented a national mandate to eliminate discrimination against individuals with disabilities, including in the workplace. The ADA and the local Philadelphia anti-discrimination law require employers in this community to prevent discrimination against qualified employees with disabilities, as well as retaliation against employees with disabilities who seek the reasonable accommodations in the workplace that facilitate equal opportunity.

In this case, CHOP refused to prevent discrimination and retaliation against a qualified and valued mental health nurse practitioner when its newly hired Attending Psychiatrist did not want to deal with the "burden" (real or imagined) of working with Mr. Sheridan after he disclosed his disabilities and asked for the same accommodations that had been easily and effectively implemented at the Hospital for over two years. Specifically, CHOP failed to enforce its own policies against disability discrimination and retaliation when it suspended Mr. Sheridan in response to a baseless and inflammatory accusation from the new Attending Psychiatrist when other similarly situated clinical providers would not have been suspended. Then, CHOP imposed a 30-day "performance plan" upon Mr. Sheridan's return to work from the suspension, even though it had not reasonably investigated the Attending Psychiatrist's accusations, nor confirmed that Mr. Sheridan had engaged in any kind of misconduct.

After Mr. Sheridan expressed concern about meeting the new psychiatrist's expectations to his immediate supervisor and Human Resources, and asked for help doing so, CHOP fired him for "insubordination" just one week into a 30-day "performance plan" without even speaking to him about the situation. Mr. Sheridan has filed this lawsuit to hold CHOP accountable for its willful violations of his civil rights, which has needlessly deprived this community of a skilled and dedicated medical provider for kids facing mental health crises.

## PARTIES

1. Plaintiff, Laurence Sheridan, is an individual who currently resides in the Commonwealth of Pennsylvania.

2. Defendant, the Children's Hospital of Philadelphia, is a nonprofit corporation, which operates a hospital and related care network locations throughout the greater Philadelphia region.

3. At all times relevant to this Complaint, CHOP was Mr. Sheridan's employer within the meaning of the ADA and the PFPO.

4. CHOP employs more than one thousand individuals in Philadelphia.

5. Defendant's discriminatory and retaliatory actions as described herein took place within Philadelphia, Pennsylvania at the following address: Children's Hospital of Philadelphia, 3401 Civic Center Boulevard, Philadelphia, PA 19104.

6. At all times relevant to this Complaint, CHOP acted by and through its authorized agents and/or employees within the course and scope of their employment at CHOP.

## JURISDICTION AND VENUE

7. This action for discrimination and retaliation is authorized and instituted pursuant to the ADA, 42 U.S.C. §12101 et seq.

8. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

9. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction with respect to Plaintiff's claims for disability discrimination and retaliation under the PFPO, Phila. Code § 9-1101, et seq.

10. This case is not subject to compulsory arbitration because Plaintiff seeks injunctive relief and the amount in controversy exceeds the jurisdictional amount for arbitration of One Hundred Fifty Thousand Dollars ($150,000), exclusive of interest and costs.

11. Plaintiff timely filed a complaint of disability discrimination and retaliation with the Philadelphia Commission on Human Relations ("PCHR") (No. 2025-05-15-20524) on May 15, 2025, which was cross filed with the Equal Employment Opportunity Commission ("EEOC") (No. 17G-2025-00049).

12. The PCHR issued its Dismissal and Notice of Rights with respect to Plaintiff's administrative complaint on August 21, 2026.

13. The EEOC issued its Notice of Right to Sue with respect to Plaintiff's administrative complaint on September 16, 2026.

14. Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

15. Venue is properly invoked pursuant to 29 U.S.C. § 1391(b) because the actions complained of herein occurred within the jurisdictional limit of this Court.

## FACTUAL ALLEGATIONS

### CHOP's Policies, Procedures, and Practices Relating to Workplace Civil Rights

16. Upon information and belief, CHOP maintains a policy that requires compliance with all federal, state, and local anti-discrimination laws, including the laws prohibiting discrimination and/or retaliation against employees with disabilities.

17. Upon information and belief, CHOP relies on its Human Resources professionals, including its HR Business Partners, to communicate its employment-related policies, train managers and employees on such policies, and to respond effectively to compliance failures.

18. However, upon information and belief, CHOP's HR professionals lack the qualifications to communicate with, train, and/or assist managers to prevent violations of the rights of employees with disabilities.

19. Upon information and belief, CHOP failed to effectively communicate and/or train its managers on the law and its policies against disability discrimination, as well as against retaliation towards employees with disabilities who seek reasonable accommodations in the workplace.

20. In addition, as a result of a lack of qualifications and/or training of the HR professionals, CHOP managers and employees are reluctant to consult with HR for guidance and/or to report concerns because they are perceived as, among other things, unavailable, untrustworthy, and unreliable.

CHOP's Behavioral Health Integrated Program

21. At its Hospital in Philadelphia, CHOP employs a Behavioral Health Integrated Program team to provide psychiatric care to hospitalized children who show symptoms of behavioral or mental health conditions.

22. The Behavioral Health Integrated Program is a multidisciplinary team that includes Attending Psychiatrists, Board Certified Behavior Analysts, Advanced Practice Providers, Psychologists, Clinical Social Workers, and Program Coordinators.

23. CHOP employes a group of Psychiatric Mental Health Nurse Practitioners (PMHNPs), who are part of the Advanced Practice Providers (APP), and who are supervised by an APP Manager.

24. In or about July 2022, CHOP hired Lauren Ermentrout, a PMHNP, as the APP Manager. Ms. Ermentrout had responsibility to supervise the PMHNPs at the main hospital and other CHOP locations.

25. At all times relevant to this lawsuit, Sue Ogle, Senior Director of Advanced Practice Providers, had supervisory authority over the APP Manager.

Mr. Sheridan's Employment History at CHOP Prior to September 2024

26. CHOP hired Mr. Sheridan as a PMHNP at the main hospital, effective May 2022, where he began his employment on a part-time basis (three days per week).

27. CHOP's team of PMHNPs are not assigned to specific areas or departments at the hospital, but instead provide psychiatric consultations to medical teams in support of patients throughout the hospital and outpatient facilities.

28. Since Mr. Sheridan worked part-time when he started at CHOP, Mr. Sheridan and his supervisors informally agreed that he would be assigned to support patients in the Emergency Department (the "ED") because the length of stays in the ED were shorter, and his part-time status would not impact the continuity of care in the same way as it would for assignments on the other hospital floors.

29. As a PMHNP, Mr. Sheridan interfaced regularly with the Attending Psychiatrists in the Emergency Department, including Wes Geddings and Tina Chen.

30. To assess and make recommendations about patients, Mr. Sheridan, as the NP, typically conducted an examination by interviewing the patient and family members, if applicable, and then collaborated with the Attending Psychiatrist to confirm a treatment plan.

31. Mr. Sheridan later recorded his observations and recommendations in EPIC, the software used by CHOP for that purpose, and the Attending Psychiatrist had the opportunity to add their own notes or attestation to the entries.

32. Soon after his employment began, Mr. Sheridan notified both Dr. Geddings and Dr. Chen that he had disabilities that could impact his work if they were not properly accommodated. Specifically, Mr. Sheridan disclosed that he has Attention Deficit Hyperactivity Disorder (ADHD), Written Expression Disorder, and Auditory Processing Disorder.

33. Mr. Sheridan's diagnoses constitute physical or mental impairments that substantially limit his major life activities, including but not limited to, his ability to concentrate and regulate his attention, express himself in writing, and process oral communications.

34. Mr. Sheridan shared with both Dr. Geddings and Dr. Chen that his conditions create differences in how he processes information and how he collaborates, sharing that it is more effective for him to communicate with colleagues orally rather than just in writing, and that he has difficulty with writing in certain situations.

35. As a result of Mr. Sheridan's proactive communications about his disabilities, Mr. Sheridan and his colleagues at CHOP worked together to accommodate his limitations and support needs. For example, Mr. Sheridan often needs additional time to prepare written recommendations (v. oral) for medical care and can get overwhelmed with requirements for detailed linear written expression.

36. To accommodate these issues, Mr. Sheridan's colleagues provided support in a variety of ways, including for example, by reviewing his treatment notes and providing feedback, encouraging him to use bullet points (rather than full sentences and paragraphs) for his treatment notes, and to focus on the key points in his recommendations, rather than recording every aspect of his analysis.

37. As a result of auditory processing disorder, Mr. Sheridan hears speakers a little later than others during conversations or when listening to a lecture. This can be alleviated if Mr. Sheridan can focus his attention while listening, such as by doodling. At times, Mr. Sheridan was also able to accommodate this issue by asking someone on the treatment team to be a scribe during patient meetings so that he could doodle while conducting the interview.

38. When Ms. Ermentrout started at CHOP as APP Manager in or about July 2022, and became Mr. Sheridan's direct supervisor, Mr. Sheridan discussed his disabilities with her as well. At the time, Mr. Sheridan shared that he was working with his colleagues to coordinate

accommodations for his disabilities so that the team could provide excellent patient care, and it was working well.

39. Mr. Sheridan let Ms. Ermentrout know about the details of his disabilities and the way they were being accommodated in the workplace so that she would feel comfortable coming to him if she ever had any performance concerns that may be related to his support needs.

40. Mr. Sheridan continued to consult with Ms. Ermentrout about his disabilities and the way they were being accommodated at work each time they discussed his performance.

41. During this period of time, Ms. Ermentrout was very supportive of Mr. Sheridan, and provided him with only positive performance feedback.

42. In February 2024, Mr. Sheridan transitioned to full-time employment in the same role. Since he had been successful in building relationships and providing excellent patient care while working in the Emergency Department, CHOP continued to assign Mr. Sheridan to the ED, rather than as part of the Clinical Liaison group that responded to patients' behavioral and mental health needs on the other hospital floors.

43. On August 6, 2024, Dr. Chen nominated Mr. Sheridan for CHOP's Physician Partnering Award. In her nomination, Dr. Chen wrote about Mr. Sheridan:

> Lance has been an incredible partner, collaborator and colleague in the Emergency Department and EDECU for Psychiatry this past year. He has been thrown into any number of challenging cases, situations which are very fraught, and has handled all situations with growing ownership, graciousness and true maturity and calm. He has been the most amazing partner to me and the other ED psychiatrists throughout this year, and we would not have been able to get through all the relentless volume and complexity of our patients this past year without Lance's steady presence and assistance. His clinical skills and liaison skills have grown immensely, and I don't think of him as a mid-level provider, but rather as a true partner every day when I'm on service, to share the workload, hard (and sometimes ridiculous) situations, triumphs and disappointments. He is invaluable as a Physician Partner, and no one is more deserving of this award!

44. In or about August 2024, Ms. Ermentrout confirmed that Mr. Sheridan was "Consistently Achieving" in his performance review for that year, and she praised Mr. Sheridan's contributions, expressed gratitude for the award nomination since it reflected positively on the nursing team, and recognized that his role in the ED was progressing towards a leadership position. Ms. Ermentrout communicated no concerns about Mr. Sheridan's work performance.

<u>CHOP Enables New Attending Psychiatrist Hired in September 2024 To Bully Mr. Sheridan Because Of His Disabilities And Undermine His Workplace Accommodations</u>

45. In or about September 2024, CHOP hired Victoria Angelucci into her first post-residency assignment as an Attending Psychiatrist in the Emergency Department.

46. Soon after Mr. Sheridan began working with her, Dr. Angelucci started giving Mr. Sheridan negative feedback about his patient documentation.

47. Dr. Angelucci's criticism of Mr. Sheridan's written documentation was not limited to her own attestations and notes in EPIC. Instead, on a number of occasions, Dr. Angelucci either demanded that Mr. Sheridan change his entries about how his observations of patients were recorded in EPIC, or deleted Mr. Sheridan's notes about his own mental status examination and replaced them with her own.

48. Over time, Mr. Sheridan grew increasingly concerned that he could not meet Dr. Angelucci's expectations about his patient documentation, even though he had previously been successfully navigating the writing requirements of his job.

49. After working with Dr. Angelucci for several weeks, Mr. Sheridan approached her on September 27, 2024, to discuss their working relationship. Mr. Sheridan disclosed his disabilities to Dr. Angelucci and explained the ways in which he had received reasonable accommodations that allowed him to adapt in the work environment with other Attending

Psychiatrists. Mr. Sheridan told Dr. Angelucci that he did not know how to meet her specific expectations for documentation.

50. During their discussion, Dr. Angelucci seemed dismissive, and simply told Mr. Sheridan words to the effect that he needed to be better at writing.

51. After meeting with Dr. Angelucci to try to resolve the issues with her directly without success, Mr. Sheridan told Ms. Ermentrout about the problems he was having with Dr. Angelucci. Ms. Ermentrout seemed to empathize with Mr. Sheridan's difficulties, and said she hoped it would get better, but she did not offer any specific suggestions.

52. Upon information and belief, Ms. Ermentrout did not speak to Dr. Angelucci about Mr. Sheridan's concerns and/or her obligations to accommodate Mr. Sheridan's disabilities as they had been successfully accommodated in the past.

53. Upon information and belief, CHOP had not provided any guidance or training to either Ms. Ermentrout and/or Dr. Angelucci about the Hospital's legal obligations in the workplace towards qualified employees with disabilities.

54. In the weeks after Mr. Sheridan disclosed his disabilities and asked for assistance in meeting her expectations for written documentation, Dr. Angelucci's criticisms of Mr. Sheridan for alleged deficiencies in his documentation of patient care escalated.

55. Upon information and belief, other members of the clinical care team also had conflicts with Dr. Angelucci about her expectations for medical documentation, but she did not harass or bully them, or demand to make changes to their progress notes, as she did with Mr. Sheridan.

56. On November 18, 2024, Mr. Sheridan was working with Dr. Angelucci to provide care to two boys of a similar age who both presented with ADHD and aggression. After

evaluating both patients, Mr. Sheridan made oral clinical recommendations to their treating physicians, one of which included a recommendation for a nutrition consultation.

57. At the end of his shift, Mr. Sheridan completed the written documentation for each patient in EPIC. In doing so, Mr. Sheridan mistakenly recorded his notes for the boys in the other boy's chart. The primary difference in the treatment plans was that a nutrition consult was included for only one of them. As part of her review of Mr. Sheridan's documentation, Dr. Angelucci noticed Mr. Sheridan's error, and then contacted him about it.

58. Since Mr. Sheridan had previously made accurate oral recommendations to the treating physician for each boy, patient care was not impacted by his documentation error, which was easily corrected as part of the collaborative review process.

59. Upon information and belief, at some point thereafter, Dr. Angelucci heard from another member of the care team that the boy's mother questioned his medication.

60. The next day, on November 19, 2024, rather than speaking with Mr. Sheridan about the issue in a collaborative way, Dr. Angelucci accused Mr. Sheridan of starting medication for one of the boys without parental consent.

61. At Mr. Sheridan's suggestion, he and Dr. Angelucci called the boy's mother, who recalled that she had consented to the medication for her son after being reminded of her conversation with Mr. Sheridan.

62. Without any reasonable basis, and unbeknownst to him at the time, Dr. Angelucci "reported" Mr. Sheridan to CHOP's Human Resources office for "endangering patient safety."

63. Later that day, Ms. Ermentrout contacted Mr. Sheridan to speak to him about the documentation error and other complaints Dr. Angelucci made about him. During that call, Ms. Ermentrout told Mr. Sheridan that they could find another placement for him within the hospital

system, such as with the other PMHNPs who worked on the other floors in the main hospital, in an outpatient center, or at the Behavioral Health and Crisis Center on Cedar Avenue. Mr. Sheridan told Ms. Ermentrout that he wanted to try to make it work in the ED, but that he would think about the Crisis Center as an option. At the end of their discussion, Mr. Sheridan believed Ms. Ermentrout understood the situation, knew that he had not engaged in any misconduct, and that the issues had been resolved.

CHOP's Discriminatory And Retaliatory Suspension and Performance Improvement Plan

64. On the evening of November 19, 2024, Ms. Ermentrout called Mr. Sheridan after he had left for the day and notified him that CHOP was suspending his employment starting the next day so that her department and Human Resources could begin an "information gathering process" based on Dr. Angelucci's alleged concerns about his performance.

65. Among other statements during the call with Mr. Sheridan, Ms. Ermentrout apologized for the situation, suggested that there had been no need for Dr. Angelucci to escalate the situation to Human Resources, and that she had never seen anyone suspended from work under similar circumstances. Ms. Ermentrout also said that she did not expect the information gathering process to take long, and that Mr. Sheridan should expect to receive a call from Human Resources the next day.

66. Upon information and belief, no other member of the Behavioral Health Integrated Program team had been suspected of "endangering patient safety" and/or suspended based on a single documentation error.

67. On November 20, 2024, Mr. Sheridan spoke with Tiffany Williams, a CHOP Human Resources Business Partner, who said she had been notified of Dr. Angelucci's concerns about Mr. Sheridan's performance, including that he wrote an incorrect recommendation for a

patient; that he allegedly started a patient's medication without obtaining parental consent; and that he was not working well with her.

68. During the call with Ms. Williams, Mr. Sheridan acknowledged the documentation error, explained that Dr. Angelucci's allegation about the lack of parental consent was wrong, and said words to the effect that he was doing his best to work with Dr. Angelucci despite her criticisms of him.

69. Ms. Williams' attitude during the call with Mr. Sheridan was nonchalant and she told him he might be able to return to work the next day.

70. Mr. Sheridan did not hear from Ms. Ermentrout or Ms. Williams about his employment status the next day, and neither of them responded to Mr. Sheridan's attempts to reach them.

71. Without explanation, CHOP's suspension of Mr. Sheridan lasted for over two weeks from November 20, 2024, until Ms. Ermentrout called Mr. Sheridan on December 5, 2024.

72. During his suspension, Mr. Sheridan was unable to obtain any further information about his employment status or the status of the "information gathering process" from either Ms. Ermentrout or Ms. Williams.

73. Dr. Angelucci's complaints to HR about Mr. Sheridan were motivated by discriminatory bias because of his disabilities and/or retaliatory bias in response to his request that she collaborate with him to accommodate his disabilities as other Attending Psychiatrists had in the past.

74. CHOP's handling of Dr. Angelucci's complaints against Mr. Sheridan, including a failure to reasonably investigate the situation and/or examine Dr. Angelucci's motives for such

complaints, violated Mr. Sheridan's right to work in an environment free from discriminatory and retaliatory bias.

75. In its Answer to Mr. Sheridan's administrative complaint filed with the Philadelphia Commission on Human Relations, CHOP claimed that it placed Mr. Sheridan on "administrative leave" due to reports that he: made medication recommendation errors; inaccurately completed patient charts; refused to review notes with his Attending Physician; incorrectly cited diagnostic codes; and performed incomplete exams.

76. CHOP's stated reasons for suspending Mr. Sheridan, which could have been easily disproved at the time, were just a pretext for disability discrimination and/or retaliation.

77. CHOP suspended Mr. Sheridan because of his disabilities, including but not limited to, the need to provide him with reasonable accommodations in the workplace.

78. CHOP suspended Mr. Sheridan in retaliation for his requests for reasonable accommodation in the workplace.

79. On Thursday, December 5, 2024, Ms. Ermentrout called Mr. Sheridan and told him he could return to work, but they were placing him on a "Focused Professional Practice Evaluation for Clinical Competency" (FPPE) for a period of thirty (30) days, until January 6, 2025.

80. CHOP did not provide Mr. Sheridan with the results of any "investigation" into Dr. Angelucci's complaints about him, and the section of the FPPE that was supposed to list the reasons for the FPPE were left completely blank.

81. The FPPE listed four (4) areas in which Mr. Sheridan had to demonstrate competency: Safe Patient Care; Documentation Accuracy; Accepting Clinical Feedback; and Professionalism.

82. In response to Mr. Sheridan expressing his frustration for being out of work for over two weeks without any communication from her about his status, Ms. Ermentrout said he was being emotional and suggested he take a paid day off on Friday, December 6, 2024, and return to work the following Monday.

83. Ms. Ermentrout also mentioned that there had been new allegations about his behavior by other colleagues in addition to Dr. Angelucci, but she refused to elaborate. Mr. Sheridan told Ms. Ermentrout that it felt as if she were trying to get him to quit, and that she was dismissing or "gaslighting" him.

84. Ms. Ermentrout provided no other instructions for Mr. Sheridan's return to work or other guidance about how to meet the expectations of the vague and incomplete FPPE.

85. On Monday, December 9, 2024, Mr. Sheridan returned to work following his suspension, and tried to discuss the FPPE with Dr. Angelucci because he assumed she would be evaluating his compliance with it. Dr. Angelucci seemed caught off guard.

86. That day, Mr. Sheridan and Dr. Angelucci saw only one patient, and they agreed about the treatment plan. However, Dr. Angelucci later told Mr. Sheridan that he needed to change his notes about the patient, who was a five-year-old girl. Specifically, Dr. Angelucci objected to Mr. Sheridan's use of the word "irritable" to describe the patient. Dr. Angelucci also said that she had completed the required safety planning with the patient's family.

87. Mr. Sheridan disagreed with Dr. Angelucci's assessment in both respects. First, Mr. Sheridan, as an experienced PMHNP, believed his observations and assessment of the patient as "irritable" was completely appropriate under the circumstances. Second, Mr. Sheridan pointed out that Dr. Angelucci had not discussed preventive measures for the home environment

with the family, which should have been completed as part of the contingency plan. Although Mr. Sheridan's demeanor remained professional, Dr. Angelucci became defensive.

88. Soon thereafter, Mr. Sheridan saw Dr. Angelucci meet with Khyati Brahmbhatt, an Attending Psychiatrist and CHOP's Chief, Division of Integrated Psychiatry, Psychology, and Behavioral Sciences.

89. After Dr. Angelucci left her office, Dr. Brahmbhatt came to Mr. Sheridan's office, closed the door, and told him that she was sorry this was happening to him, that she had only heard positive things about his work, that no one else had any problems with him, that she had no concerns about his ability to practice safely, and she understood that errors happen.

90. Since he assumed Dr. Angelucci had complained about him again to Dr. Brahmbhatt, Mr. Sheridan let Ms. Ermentrout know that his return to work had not gone well, and that he would wait for further guidance from her.

91. The next day, on December 10, 2024, Ms. Ermentrout asked Mr. Sheridan to participate in a Zoom call with her and Ms. Williams from HR. During that call, Ms. Ermentrout confirmed the following, among other things: the performance criteria in the FPPE was not clearly defined, and put Mr. Sheridan in a position to be set up to fail; and she did not feel comfortable with Dr. Angelucci being the only one observing and evaluating his performance on the FPPE.

92. During the Zoom meeting, Ms. Ermentrout also seemed to contradict herself as to whether and under what circumstances Mr. Sheridan could see patients without an Attending Psychiatrist present, whether or not it was Dr. Angelucci.

93. During the call, Mr. Sheridan explained that he had concerns about Dr. Angelucci's expectations, and needed help meeting them. Mr. Sheridan also suggested that he

take Ms. Ermentrout up on her prior offer to be reassigned away from the Emergency Department since Dr. Angelucci seemed to be the only one who had problems with his performance. Ms. Williams and Ms. Ermentrout denied Mr. Sheridan's request.

94. Ultimately, Ms. Ermentrout said she would come to the ED daily to be the one to complete Mr. Sheridan's evaluations for the FPPE, and said she would meet him there later that day. Ms. Ermentrout also indicated that Mr. Sheridan should not see patients unless she was with him. However, Ms. Ermentrout did not appear at the ED in person on December 10 or the next day.

95. On Thursday, December 12, 2024, Ms. Ermentrout, who usually worked remotely, met Mr. Sheridan at the main hospital. After Mr. Sheridan gave Ms. Ermentrout a tour, they attended rounds with Dr. Angelucci and the rest of the care team, including the Child Life Specialist and the Social Worker.

96. At one point during the day, the Child Life Specialist pulled Mr. Sheridan aside to say that she had instructed her team to be cautious when working with Dr. Angelucci because they did not feel comfortable having open clinical discussions with her.

97. In mid-afternoon on December 12, 2024, Ms. Ermentrout left the ED, saying she had an emergency.

98. On Friday, December 13, 2024, Ms. Ermentrout did not contact Mr. Sheridan or provide him with any instructions for the day. Although Mr. Sheridan was listed on the schedule to work in the Emergency Department that day, he understood that he could not see patients without Ms. Ermentrout being present.

99. Kaitlin Goy, a PMHNP who usually worked in CHOP's location in King of Prussia, was at the main hospital that day. Mr. Sheridan explained to Ms. Goy and the Attending

Psychiatrist in the ED, Aateqa (Atti) Ismail, that he could not see patients without Ms. Ermentrout, even though he was on the schedule.

100. Ms. Goy mentioned that the number of patients requiring assistance from the PMHNPs on the other hospital floors was light, and she offered to work in the ED that day.

101. Later that day, Ms. Goy returned to Mr. Sheridan's office and told him that Ms. Ermentrout had questioned her about whether he had "instructed" her to go the ED, and not to let Mr. Sheridan know about her questions. Ms. Goy confirmed that she volunteered to go to the ED.

CHOP's Discriminatory and Retaliatory Termination of Mr. Sheridan's Employment

102. On Monday, December 16, 2024, Mr. Sheridan arrived at the hospital, expecting to work with Ms. Ermentrout. Instead, Ms. Ermentrout directed Mr. Sheridan to meet him in a "huddle room" where she was sitting with her boss, Sue Ogle. Ms. Williams participated remotely on Zoom.

103. As soon as Mr. Sheridan sat down, Ms. Ermentrout asked him whether he told Ms. Goy to work in the ED the prior Friday. When Mr. Sheridan explained what transpired that day, Ms. Ermentrout claimed that he had engaged in "insubordination" and that he should have contacted her or one of the Attending Psychiatrists (Dr. MacGregor) about scheduling issues.

104. Upon information and belief, no other member of the Behavioral Health Integrated Program team had ever been accused of "insubordination" and/or terminated for communicating to colleagues about provider coverage.

105. Mr. Sheridan denied the accusations against him and said the situation was unfair.

106. In response, Ms. Ogle said words to the effect that she was concerned that he did not receive feedback well from physician partners, and that she had concerns about safety and

communication. Several times, Mr. Sheridan asked for examples of his alleged misconduct. Ms. Ogle never provided any specific examples.

107. Mr. Sheridan explained to Ms. Ogle, whom he had just met, that he was a very safe and good collaborator, that it was an honor for him to work at CHOP, and that if they had a chance to work together for a day, he thought she would be happy with his work.

108. In response, Ms. Ogle's affect seemed to change, and she said she was sorry, which made Mr. Sheridan think that she did not have a complete picture of his employment history or recent performance.

109. Mr. Sheridan turned to Ms. Ermentrout to say that he still did not understand why he was being terminated, and asked if there were any other reasons. Ms. Ermentrout said: yes, the flu shot.

110. Earlier in the year, Mr. Sheridan had requested an exception to the hospital's requirement to get a flu vaccine for medical reasons, and he missed several days of work while the hospital was waiting to get confirmation from his physician.

111. Prior to December 16, 2024, no one from CHOP had suggested that there was any problem with his exception for the flu vaccine.

112. At that time, CHOP's HR Partner, Ms. Williams, made a choice not to enforce the Hospital's policies against discrimination and retaliation by facilitating Mr. Sheridan's firing without any reasonable investigation into the purported reasons and/or motives for the termination decision.

113. Ms. Williams told Mr. Sheridan that he had to go pack up his office and that he would be escorted out by security guards.

114. CHOP's stated reasons for terminating Mr. Sheridan's employment were just a pretext for disability discrimination and/or retaliation.

115. CHOP terminated Mr. Sheridan's employment because of his disabilities, including but not limited to, the need to provide him with reasonable accommodations in the workplace.

116. CHOP terminated Mr. Sheridan's employment in retaliation for his requests for reasonable accommodation in the workplace.

117. Just a few months after CHOP refused to enforce its own policies to prevent Mr. Sheridan's discriminatory and/or retaliatory firing, CHOP no longer employed either Dr. Angelucci or Ms. Ermentrout.

118. As a result of Defendant's refusal to enforce its own policies against disability discrimination and retaliation, CHOP patients and their families have been deprived of clinical care from a skilled and dedicated psychiatric nurse practitioner.

119. As a result of Defendant's discriminatory and/or retaliatory actions, Mr. Sheridan has suffered, and will continue to suffer, a loss of earnings and/or earning capacity.

120. As a result of Defendant's discriminatory and retaliatory actions, Mr. Sheridan has suffered, and will continue to suffer, emotional distress and mental anguish as well as harm to his professional reputation.

121. Defendant's discriminatory and/or retaliatory actions were willful and made with malice and/or reckless disregard for Mr. Sheridan's civil rights and warrant the imposition of punitive damages.

COUNT I
Disability Discrimination in violation
of the Americans with Disabilities Act

122. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

123. Defendant violated the Americans with Disabilities Act by discriminating against Plaintiff on the basis of disability by suspending and then terminating Plaintiff's employment because of his disabilities, including but not limited to, the need to make reasonable accommodations in the workplace.

COUNT II
Disability Discrimination in violation of the
Philadelphia Fair Practices Ordinance

124. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

125. Defendant violated the Philadelphia Fair Practices Ordinance by discriminating against Plaintiff on the basis of disability by suspending and then terminating Plaintiff's employment because of his disabilities, including but not limited to, the need to make reasonable accommodations in the workplace.

COUNT III
Retaliation in violation of the
Americans With Disabilities Act

126. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

127. Defendant violated the Americans with Disabilities Act by suspending and then terminating Plaintiff's employment in retaliation for his requests for reasonable accommodation of his disabilities.

COUNT IV
Retaliation in violation of
Philadelphia Fair Practices Ordinance

128. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

129. Defendant violated the Philadelphia Fair Practices Ordinance by suspending and then terminating Plaintiff's employment in retaliation for his requests for reasonable accommodation of his disabilities.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Laurence J. Sheridan, respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A. Declaring the acts and practices complained of herein to be a violation of the Americans with Disabilities;

B. Declaring the acts and practices complained of herein to be a violation of the Philadelphia Fair Practices Ordinance;

C. Awarding to Plaintiff back pay and front pay;

D. Awarding to Plaintiff compensatory damages for all other compensation and benefits lost due to Defendant's actions, including the loss of student loan forgiveness pursuant to the Public Service Loan Forgiveness Program;

E. Awarding to Plaintiff compensatory damages for all past and future non-economic damages he suffered as a result of Defendant's discrimination and retaliation, including but not limited to emotional distress, mental anguish, and harm to his professional and academic reputation;

F. Awarding to Plaintiff punitive damages for Defendant's willful and/or reckless disregard for his legal rights;

G. Awarding to Plaintiff all costs, disbursements, and reasonable attorneys' fees relating to the enforcement of his rights;

H. Awarding to Plaintiff pre-and post-judgment interest as well as the sum necessary to make up for any adverse tax consequences incurred by him as result of any judgment entered in this matter; and

I. Granting to Plaintiff such additional relief as the Court deems just and proper under the circumstances.

JURY TRIAL DEMANDED

Plaintiff hereby requests a jury trial on each of the Counts in this Complaint.

UEBLER LAW LLC

*/s/Julie A. Uebler*
Julie A. Uebler, Esquire (ID No. 71297)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
(484) 875-3186 (Voice)
(484) 875-9273 (Fax)
uebler@ueblerlaw.com

*Attorney for Plaintiff*
*Laurence J. Sheridan*